UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **JAN KAMMANN,** <br>          Plaintiff, <br> v. <br><br> **FRAUNHOFER USA,** <br>          Defendant. | **CASE NO.:**    21-cv-682 <br><br><br> **PLAINTIFF DEMANDS A JURY** |

Collin H. Nyeholt (P74132)
LAW OFFICES OF
CASEY D. CONKLIN, PLC
4084 Okemos Road, Ste B
Okemos, MI  48864
(517) 522-2550
collin@caseydconklin.com

## COMPLAINT and JURY DEMAND

### STATEMENT OF THE CASE

Plaintiff, Jan Kammann, is the victim of a rush to judgment because of his sex. Mr. Kammann was accused of sexual harassment by an Intern at his work. The powers-that-be at Defendant Fraunhoffer immediately decided that the Intern's version of events was truthful and did not offer Mr. Kammann a meaningful chance to provide information in his defense. One of the individuals who made the termination has commented, with respect to the investigation and termination decision, that Mr. Kammann "is 40-year-old man with children at home. She's a 19-year-old girl. Who's going to believe him?" or words substantially to that effect. The Defendant's managers chose to take the Intern's word over Mr. Kammann's, and chose to deny

1

him a meaningful opportunity to answer her allegations prior to terminating his employment, based upon adverse consideration of his sex. In so doing, the Defendants subjected him to unlawful discrimination because of same.

## JURISDICTION AND VENUE

1. This is a claim for violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 USC § 2000e and Michigan's Elliott-Larsen Civil Rights Act (ELCRA), MCL § 37.2101 *et seq*.

2. Plaintiff JAN KAMMANN is a German national and, currently, a permanent resident of the Country of Germany. At the time of the events described herein, he was lawfully a resident of Okemos, Michigan who regularly worked in East Lansing, Michigan.

3. Defendant FRAUNHOFFER USA ("Defendant FRAUNHOFFER") is a business entity organized under the law of the State of Michigan that regularly does business in the State of Michigan.

4. This claim stems from Defendant's actions towards Plaintiff during the course of his employment that occurred in the City of East Lansing, State of Michigan.

5. The Court may exercise subject matter jurisdiction over the claims stemming from federal law pursuant to 28 USC § 1331.

6. This is the proper venue for the Title VII claims because, pursuant to 42 USC § 2000e-5(f)(3), a private cause for violation thereof "may be brought in any judicial district in the State in which the unlawful employment practice in alleged to have been committed."

7. The Court may exercise pendent jurisdiction over the state law claims pursuant to 28 USC § 1367.

**ALLEGATIONS**

8. Plaintiff repeats and re-alleges the factual statements and legal assertions contained in the previous numbered paragraphs as if fully restated herein.

9. Plaintiff is a German national who emigrated to the United States to become an employee of Defendant.

10. In 2020, he was accused of sexual harassment by a Fraunhofer Intern who shall be referred to as DW.

11. To understand this case, one must understand the background of DW's background. She is a Syrian refugee whose family emigrated to Germany when she was a young girl. She began dating German boys, which earned the ire of her more traditional Syrian father. His disapproval turned to violence and abuse. DW told Plaintiff that, on one occasion, that he took the streets to find her and almost broke her arm trying to pull her into a car. She escaped, moved in with a foster family, and changed her last name. She expressed to Plaintiff that she is afraid of her family finding out where she is living, and so she takes steps including avoiding using social media or having her picture on same or even the Fraunhofer or MSU website. She also expressed fears of having her image documented by law enforcement, because of concerns with her father locating her.

12. When she entered college, DW became best friends with Plaintiff's second-cousin, Marianne Brügmann. In the fall of 2019, Ms. Brügmann asked Plaintiff if she could forward him DW's business contact because she was looking for an internship abroad. Mr. Kammann agreed and he and DW began exchanging text messages after Ms. Brügmann. In December of 2019, Mr. Kammann and his family visited Germany. During the visit, he and Ms. Brügmann discussed the

3

possibility of DW working at an internship available in East Lansing. Plaintiff's wife was involved in this conversation, and was aware at all times of his contacts with DW.

13. Plaintiff was instrumental and involved in helping DW apply for her internship in the East Lansing area, and helped her with her travel and visa arrangements.

14. On March 12, 2021 she arrived in Detroit.

15. It was not uncommon for Mr. Kammann to drive to Detroit to pick up international interns for Fraunhoffer. However, this time, he was there to meet DW as a family friend. At the airport, DW saw Mr. Kammann and ran up and hugged him which made Plaintiff nervous due to Covid. She and Plaintiff stopped for dinner on the way to East Lansing, and then he dropped her at the student house in East Lansing. When he dropped her off, he found that she had come bearing gifts: an assortment of German DVDs and books for his children.

16. DW's internship at Fraunhoffer began a few days later.

17. DW's stay in the United States was instantly problematic. The state issued a lockdown due to the Pandemic, which limited DW's access to the Fraunhofer lab facilities, and left DW stranded at the student house when not working. In addition, DW had purchased a vehicle, sight unseen, from an international intern who was leaving at this point of time and the car was not in working order. Worse, she was prevented from registering the vehicle, securing a United States driver's license and care insurance, and other required government document because the Secretary of State, Social Security Administration, and the International Office at MSU closed their offices. It was truly a mess for her.

18. Mr. Kammann, a former international intern himself, was familiar with the legal machinations that one must satisfy. He frequently helped the international interns navigate the

byzantine process of securing legal registration. Plus, DW was a family friend. He agreed to help her with the problems she was encountering.

19. DW was not in Plaintiff's department at Fraunhofer and he did not have any direct supervision over her. But, both she and Plaintiff had permission to enter the lab during the pandemic. Plaintiff, because of his position and she because she was working on a Covid 19 related project. Plaintiff sometimes, and mainly upon DW's request, assisted her with issues she encountered such as missing platinum wire, broken centrifuge, PPE and questions for chemical waste disposal..

20. DW and Mr. Kammann also continued to text each other, sometimes related to work and sometimes related to personal.

21. On the weekends, and during lunch, Mr. Kammann would sometimes drive DW places, due to her transportation issues such as driving her to the Chase bank drive through counter in Okemos.

22. Mr. Kammann quite enjoys good conversation, and DW seemed to as well. Sometimes, while driving, they would stop and talk to each other.

23. Mr. Kammann also enjoys "Kuscheln" which is when two friends who are conversing will sit close together and even cuddle. This is not an expression of sexuality, or an avenue to sex. Rather, it is an expression of physical closeness.

24. Plaintiff expressed his interest in non-sexual Kuschelen to DW and she responded seemingly favorably.

25. On April 18, 2020, during one of their frequent personal text messages, DW expressed that she too was interested in "Geschenke, essen, Ideen die ich vorhab, **kuscheln** und Ergebnisse von

Sachen die ich gemacht hab" which translates to "Presents, food, ideas that I have in mind, cuddles and results of things that I have done."

26. On May 6th, the night before Plaintiff's birthday, he and DW hung out in his car, talked, and also hugged and cuddled. There was nothing sexual about their interaction and DW sent him about 110 text messages to him the next day, all of which were positive sounding

27. It should be noted that FhUSA's Harassment Policy does not prohibit consensual relationships, even consensual *sexual* relationships, between members of staff and their subordinates. In fact, FhUSA's policy manual provides a procedure staff may follow when two consenting parties in the same chain of command enter into a consensual sexual relationship. The parties are required to disclose the relationship. After disclosure of the relationship, the company evaluates whether to reassign the subordinate employee. It is as simple as that.

28. On the morning of May 31, 2020, DW texted Plaintiff and asked him if he "ha[s] by any chance time tomorrow around 9:00?" She informed him that she had two appointments in Mason at that hour, and asked if he was available to drive her. She was referring to appointments with the Secretary of State that she needed to complete in order to get her registration completed for her car, and to secure her driver's license, so that she could begin to drive. Plaintiff agreed to help her.

29. On June 1, 2020 Plaintiff picked DW up from the student house, and drove her around to her appointments in Mason to get her registration and licensure so that she would be able to drive.

30. On the morning of June 2, 2020 DW text messaged Plaintiff and told him she was "really upset" and that "someone does not want me to stay here" because "the car that I waited three months to get doesn't work." Plaintiff discussed the problem with her and was able figure out that the battery needed to be jump started and then driven to charge the vehicle. He calmed DW,

and told her "we'll fix it." DW, however, could not meet him at 3:00 PM because she was working in the lab. At 3:00 PM, she texted him that "I need about an hour still." After work, she had a cookout with friends to attend. At 8:45 PM, she texted him "I expect to be here until about 10:00."

31. Finally, after DW finished with her cookout, Mr. Kamman came to the student house and tried to jump start the battery. He found that it was too low so drove home and picked up a spare battery from his garage, drove back, and changed out the battery in her car. He and she then set out to drive around in order to ensure it was appropriately charged. DW drove the car. She drove, and Plaintiff rode with her in case there were problems.

32. To ensure the battery was appropriately charged, the pair drove some distance and for quite some time.

33. The conversation was good, and Plaintiff suggested that they pull over in a Costco parking lot to talk. The parking lot was well lit and monitored and there were numerous residential and businesses surrounding it.

34. During the drive, Plaintiff asked DW is she would be comfortable with "Kuscheln" while talking. She said that she was. DW proceeded to pull into a Costco parking lot so they could cuddle and talk. The front seat was uncomfortable for this, and so Plaintiff asked if she was comfortable moving to the back seat so there would be more room. She agreed. Plaintiff got out of the car and moved to the back seat. DW did as well. They continued to talk.

35. In the midst of their conversation, a Costco security car pulled up behind them. The security guard demanded to see DW's identification, believing her to be a minor. (She was 20 years old.) He took pictures of the license plate to the vehicle, believing her to be a minor.

36. DW was terrified by the security guard's actions. Her terror was largely attributable to her justifiable fear that the picture documentation would put her birth family a step closer to locating her.

37. After the security guard left, Plaintiff and DW drove back to the student house. DW hugged Plaintiff good bye. Plaintiff got in his car and drove home.

38. At about 1:00 AM June 3rd, DW texted Plaintiff and told him the situation made her uncomfortable. He texted her "I hope we have no misunderstanding" and she responded "[i]f so, we can also overcome it. I'm not offended or just stop talking to you."

39. On June 3rd, DW spoke to her direct supervisor, Suzanne E Witt, PhD, about the Costco incident and the ongoing situation with Plaintiff.

40. At noon on June 3rd DW and Plaintiff exchanged additional text messages. In apparent response to Dr. Witt's comments, DW stated that she felt "pressured in a situation where I don't want to be." Plaintiff responded "[t]hat was not my intention. I am sorry."

41. According to her notes, when she spoke to Witt, DW stated that Plaintiff had picked her up to drive her around once before and, while driving around in the car, Plaintiff asked her in the car if she wanted to hold hands or have kuscheln and, when she said no, he respected that. She told her that the second time he drove her, they went to a "private place" referring to the Costco. She claimed that at the second time, she told him she was not comfortable and he "kept on a few more times."

42. On June 4th, Plaintiff texted DW to tell her "I hope you are feeling better today" and that her "car battery is fully charged again."

43. Meanwhile, on June 4th, Dr. Witt emailed Veronica Hensler, of Defendant's HR, and reported that "someone that reports to me confided in me about ongoing sexual harassment from

8

another employee. The behavior they described was deeply troubling, especially since the harasser is in a more senior position to the person being harassed. *They were able to tell the harasser to stop, and so far they appear to be respecting that, but I worry that this might happen again if their behavior is not addressed."*

44. Veronica Hensler in turn forwarded Dr. Witt's HR question, and the email above, to Kathleen Schuelke, Defendant's Director of Human Resources, approximately 40 minutes later.

45. Schuelke proceeded to interview DW about her allegations by phone. During the conversation, DW told Schuelke that Plaintiff "picked her up and drove her around" and that "on the drive he asked her if she wanted to 'cuddle' (German word 'Kuscheln'), he tried to touch her, hug her and hold her hand" but "she told him she was not comfortable with it *and it stopped.*" Further, DW told Schuelke that "*since the last time she told him she was not comfortable with te situation (a day or two prior), he had not contacted her.*"

46. Schuelke then contacted John Albrecht, the Center Director where Plaintiff and DW were employed, and informed him of the situation. He and she agreed to set up a meeting with Plaintiff at 9:30 AM on Friday, June 5th in Albrecht's office.

47. The morning of June 5th, Schuelke contacted Bill Calore, Defendant's Director of Legal Affairs and Contacts, and advised him of the situation. He provided advice and discussed steps to be taken.

48. During the June 5th meeting, Plaitniff confirmed that he had had many good discussions with DW, some work and some personal, which he indicated he likes because it is difficult to find good conversations. He admitted to asking DW for "Kuscheln," but stated truthfully that this was purely a friendship thing. He denied any sexual contact or kissing (because this did not happen).

9

49. Plaintiff also read the text messages he had exchanged with DW to Schuelke during the interview. Later that day, he emailed the complete text messages from 05/31 2020 to 6/4/2020 in German to Schuelke.

50. On June 6, 2020 Schuelke called DW. After she "reassured her" and "commended her for her correct actions to report and for her bravery" she asked additional questions. During this conversation, DW stated that "he tried to touch me about a month ago and I told him I can't give it to him, and in between times he tried a couple of times but I refused." Schuelke then agreed to meet with DW and Suzanne Monday outside the building.

51. On June 7, Schuelke and Witt coordinated with John Albrecht arranged a meeting place in the Leo Kempel Engineering. Schuelke arranged to have Witt meet DW ten minutes before the meeting so "we can enter the building and go to the room together."

52. On June 8th, Kathleen Schuelke met with DW and Dr. Witt. During this meeting, DW expanded her allegations to stated that "the pressuring her to 'cuddle' started early on, and that [Plaintiff] was 'constantly' talking to her about his sexual experiences and sex in general" and she "didn't want to hear it but didn't know what to do about it." Schuelke asked DW if Plaintiff "tried to touch her sexually at any time" and she "said one time he tried to touch her buttocks, but she told him she didn't want it and he stopped."

53. DW went so far as to say "'it was so weird and uncomfortable' with [Plaintiff] that when [he] would pick her up she would text her friends and say where they were going and if they didn't hear from her in two hours to call the police."

54. "At this point" wrote Schuelke" I was very comfortable informing the both of them that there was an extremely high likelihood of termination of employment, and let them know that the

10

termination would likely take place on Tuesday, and reminded [DW] that he had already been told not to contact her."

55. Schuelke emailed John Albrecht and Bill Calore about the results of the June 8th meeting, and her intention to terminate Plaintiff as a result of the meeting.

56. Albrecht and Calore approved and ratified the knee-jerk decision that Schuelke made, on June 8, 2021, to terminate Plaintiff's employment.

57. Schuelke proceeded to transmit termination documentation to Plaintiff on June 9, 2020.

58. In so doing, Schuelke, Albrecht, and Calore refused to provide Plaintiff with any opportunity, whatsoever, to address DW's newly minted allegations she made the day before. Plaintiff requested twice before the termination to defend himself and to provide more information on the case, once via Email and once via SMS. Both have been rejected.

59. Had Schuelke bothered to give him a chance to respond, Plaintiff would have pointed out that he never attempted to touch DW's buttocks. On one occasion in the car while talking, he touched her leg for emphasis. The way they were seated in the car, he could not have physically reached her buttocks without first throwing her from the seat. This allegation was absurd.

60. Had he been interviewed about DW's allegation that she was "uncomfortable" discussing sex with him, Plaintiff would have pointed them to numerous text messages where she expressed she was comfortable with such discussions. He really had no reason to know this was making her uncomfortable, and would certainly have stopped had she communicated that.

61. Had he been given even a modicum of due consideration in Schuelke, Calore, and Albrecht's rush to judgment, he would have pointed out the absurdity of DW's assertion that she was "uncomfortable" driving around with him because *she* texted *him* and *asked him to do this!*

11

62. The Defendant never, for a moment, even *considered* that Plaintiff may be innocent and that DW's ever-changing allegations against him could be false.

63. Bill Calore, legal counsel, has commented on one occasion commented, referring to the termination, that Plaintiff "is 40-year-old man with children at home. She's a 19-year-old girl. Who's going to believe him?" or words substantially to that effect.

64. Plaintiff filed EEOC charge number 471-2020-04192 alleging sex discrimination in violation of Title VII of the Civil Rights Act, and retaliation for opposing same, on April 14, 2021.

65. On May 20, 2021, because 180 days had passed in the EEOC's processing of the claim, the EEOC terminated its processing of the charge and issued a right-to-sue letter. This complaint timely follows.

### COUNT 1 – SEX DISCRIMINATION
*In Violation of the Title VII*
**As Against Defendant MBC**

66. Plaintiff repeats and re-alleges the factual statements and legal conclusions contained in the previous numbered paragraphs as if fully restated herein.

67. Plaintiff is a "person" and an "employee" as those terms are used in Title VII, 42 USC §§ 2000e(a) and 2000e(f).

68. Defendant was Plaintiff's "employer" as that term is used by 42 USC § 2000e(b).

69. Title VII of the Civil Rights Act of 1964 prohibits an employer, such as FhUSA, from discrimination against an employee, such as my client, based upon his sex.[1] The prohibition on sex-based discrimination is violated when an employer makes adverse decisions against an

---

[1] 42 USC § 2000e

employee based upon attitudes or stereotypes about their sex.[2] This applies when an employer responding to an allegation of sexual harassment assumes truthfulness to a female accuser over the word of a male, based on assumptions about their sex. The United States Second Circuit Court of Appeals recently considered a claim, just like Mr. Kammann's, where a male supervisor was pressured to resign after a female subordinate made allegations of sexual misconduct.[3] The male supervisor denied misconduct. But, the HR department told him "you're a man. No one will believe you" and so he resigned. The Court held that, under these circumstances, HR's decision to believe the accuser over the accused was based on unlawful biases and stereotypes towards males. That being the case, the Court upheld a judgment on behalf of the falsely accused supervisor of gender discrimination. Our own federal circuit, the Sixth, has recently upheld multiple claims of gender discrimination when a university arbitrarily accepts a female accuser's allegations of sexual assault over a male's based upon gender stereotyping and similar biases.[4]

70. There is an unfair gender stereotype that males are only nice to females because they desire sex. This stereotype informed the Defendant's investigation of DW's allegations against Plaintiff. It caused them to instantly believe DW and instantly disbelieve Plaintiff. "He's a 40-year-old man with two kids at home. She's a 19-year-old girl. Who's going to believe him?"

71. The Defendant's consideration of unfair, negative, gender stereotypes influenced the outcome of their investigation of DW's allegations, and therefore influenced the decision to terminate his employment.

72. The Defendants, because of their anti-male biases, never even *considered* that Plaintiff could be innocent of the allegations against him.

---

[2] *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)
[3] *Sassaman v. Gamache,* 566 F.3d 307 (2d Cir. 2009).
[4] *Doe v. Baum*, 903 F.3d 575, 585-87 (6th Cir. 2018) (adjudicator bias, favoring female testimony but discrediting males, enough to state claim of sexual discrimination.); *Doe v. Miami Univ.*, 882 F.3d 579, 594 (6th Cir. 2018)

73. Further, due to their anti-male stereotypes, the Defendant's agents never even *considered* lesser disciplinary measures including time away from work until DW's internship concluded in July of 2020.

74. Plaintiff, a male, received disparate treatment to DW, a female, during the investigation process multiple times.

75. Human Resources Director Schuelke called DW several times, and interviewed her in person several times. Special arrangements were made to ensure that DW was made comfortable at all times during the interview that were not afforded to Plaintiff. Schuelke made the decision to terminate Plaintiff contemporaneously with DW's statement that "'it was so weird and uncomfortable' with Jan that when Jan would pick her up she would text her friends and say where they were going and if they didn't hear from her in two hours to call the police" without offering Plaintiff a chance to address this new allegation *at all*.

76. Bill Calore and John Albrecht approved and ratified Schuelke's knee-jerk decision to terminate Plaintiff, again offering him no chance to respond to this allegation.

77. Schuelke, a female, was the primary driving force behind the allegations against Plaintiff. No male person ever asked Plaintiff one single case related question. In fact, Center Director Albrecht admitted after the interview on June 5th that he wasn't even aware of the questions Schuelke was going to ask. Plaintiff never met Calore due to Calore being a recent hire and lockdown. Additionally Schuelke told Plaintiff to update her on the investigation process during the interview but Plaintiff has been kept in the dark even after the termination requesting e.g. the exact allegations. It took 3 months and a lawyer to find out the exact allegations, what added emotional pain.

78. Schuelke, Calore, and Albrecht were the persons who recommended, considered, appoved, ratified, and made the decision to terminate Plaintiff's employment.

79. Schuelke, Calore, and Albrecht were acting as managerial agents of Defendant Fraunhofer when they made the unlawful, sex-based decision to terminate Plaintiff's employment.

80. As a result of the foregoing, Plaintiff has suffered

    a. Lost wages,

    b. Emotional pain and distress,

    c. Attorney's fees in opposing same.

81. Plaintiff is also entitled to punitive damages, by reason of Defendants' willful and wanton conduct described herein.

**COUNT 2 – SEX DISCRIMINATION**
*In Violation of Michigan's Elliott-Larsen Civil Rights Act, MCL 37.2101 et seq*
**As Against All Defendants**

82. Plaintiff repeats and re-alleges the factual statements and legal conclusions contained in the previous numbered paragraphs as if fully restated herein.

83. Michigan's Elliott-Larsen Civil Rights Act (the "ELCRA") provides, in pertinent part, that "an employer shall not … [f]ail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of … sex . . . ." MCL 37.2202. The ELCRA is largely coextensive with Title VII, particularly with respect to gender-based discrimination claims. *Barbour v. Department of Social Services,* 198 Mich.App. 183 (1993) (applying Title VII precedent to ELCRA sex discrimination claim.)

15

84. For the reasons stated previously, Plaintiff has suffered disparate treatment by reason of his sex. And, he suffered an unlawful employment decision based upon adverse consideration of gender stereotypes.

85. Plaintiff has suffered damages including:

    a. Lost front pay and benefits, both historical and prospective,

    b. Emotional pain and distress resulting from the mistreatment described herein,

    c. Attorney's fees in opposing age based discrimination.

86. Plaintiff is also entitled to an award of exemplary damages, by reason of Defendants' knowing, intentional, and willful violation of his rights under Michigan Law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests the following relief from this Honorable Court:

1. ECONOMIC DAMAGES including, but not necessarily limited to, lost front pay and benefits from the paid position he was denied;

2. Such other COMPENSATORY damages as may be appropriate to compensate Plaintiff for Defendant's unlawful conduct;

3. EXEMPLARY damages, in whatever amount the Court should deem appropriate;

4. PUNITIVE damages, in whatever amount the Court should deem appropriate,

5. ATTORNEY'S FEES, in an amount determined reasonable by the Court, so wrongfully incurred in order to remedy the violation of his rights described herein, pursuant to the various statutes identified herein;

6. Pre and post judgment interest at the appropriate statutory rate, and

7. Such other relief as this Court may deem just and appropriate in law or in equity.

## PLAINTIFF DEMANDS A JURY

Respectfully Submitted,

Dated: 8/9/2021

 */s/  Collin H. Nyeholt*
Collin H. Nyeholt,
Attorney for the Plaintiff